# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

**FILED**

NOV 20 2013

U.S. BANKRUPTCY COURT
BY_____DEPUTY

BK 08-61141
ADV. 11-6005

| | |
|---|---|
| IN RE:<br>SIMONS BROADCASTING, LP,<br>    Debtor, | §<br>§<br>§<br>§ |
| ROBERT MILBANK, JR., in his<br>capacity as Plan Implementation<br>Agent,<br>    Plaintiff & Counter-Defendant, | §<br>§<br>§<br>§<br>§ |
| v. | § |
| MICHAEL SIMONS, and<br>PROMISELAND TELEVISION<br>NETWORK, INC.,<br>    Defendants &<br>    Counter-Plaintiffs, | §<br>§<br>§<br>§<br>§<br>§ |
| and | § |
| PROMISELAND TELEVISION<br>NETWORK, INC.,<br>    Cross-Plaintiff, | §<br>§<br>§<br>§ |
| v. | § |
| EVERETT G. STRONG, BRIAN<br>BYRNES, PARAMOUNT MEDIA<br>ADVISORS, INC., KTAQ OF<br>DALLAS, and PLATINUM EQUITY,<br>LLC,<br>    Cross-Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§ |

**Civil No. W-11-CA-172**

## MEMORANDUM OPINION AND ORDER

Before the Court is a civil lawsuit that was tried before a jury.   At the close of

evidence, various parties moved under Rule 50 of the Federal Rules of Civil

Procedure for judgment as a matter of law as to all the claims presented to the jury.

After due consideration of the evidence and applicable legal authority, the Court

determined that each motion should be granted.   Pursuant to Rule 50, the Court

now issues this Memorandum Opinion and Order in accordance with that prior

ruling.

## I. BACKGROUND

This case arises out of the enforcement of a Chapter 11 Plan.   Prior to the

bankruptcy, the Debtor, Simons Broadcasting, was a Texas limited partnership.

All equity interests in Simons Broadcasting were owned or controlled by Michael

Simons individually as limited partner, and as president of its general partner,

Simons Asset Management.   Simons is also the president and board member of

PromiseLand Television Network ("Promiseland"), a non-profit organization;

however, as a Section 501(c)(3) non-profit, Promiseland was incorporated as a

distinct entity apart of Simons Broadcasting.   Pursuant to its incorporation,

Promiseland's main purpose involved promoting and selling airtime to religious

organizations and commercial advertisers as well as distributing programming via

satellite and internet channels.   In 2005, Promiseland entered into an airtime

agreement with Simons Broadcasting, which gave Promiseland the exclusive right

to purchase all the airtime of KTAQ, a television station in the Dallas-Fort Worth

area that was owned and operated by Simons Broadcasting.   Though

Promiseland provided its programming on the Internet as well as for satellite television, its primary broadcasting was on KTAQ.

In 2008, Simons Broadcasting filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the Western District of Texas, Waco Division. The Bankruptcy Court confirmed the First Amended Plan ("Plan"). The Bankruptcy Court named Robert Milbank, Jr. ("Plan Agent") as the Plan Implementation Agent, and his responsibilities included managing the Debtor's assets and operations as well as conducting an orderly liquidation. As part of the Plan, Milbank held the exclusive right to run KTAQ. By the terms of the Plan, the exclusive airtime agreement between Simons Broadcasting and Promiseland was terminated. However, throughout the course of the bankruptcy and after confirmation of the Plan, Promiseland continued to purchase airtime and provided programming to KTAQ. During the administration of the Plan, Milbank hired Brian Byrnes and his company, Paramount Media Advisors, to assist in the operations of KTAQ during the bankruptcy process. The Creditors, Platinum Debt Group and Platinum Equity, eventually purchased KTAQ at an auction in June 2010, through the newly formed entity, KTAQ of Dallas.

Shortly after the confirmation of the Plan, Milbank met with Simons to discuss the implementation process and Simons' participation as president of the Debtor. The Plan and the Order Confirming Chapter 11 Plan ("Order") required the Debtor to give the Plan Agent all income generated from the KTAQ asset, as

well as an accounting of its estate.   Since the religious organizations were already paying Promiseland to broadcast its programming on KTAQ, Milbank and Simons agreed that Promiseland would continue accepting payments on behalf of the Debtor's estate, remit the payments to Milbank, and transmit the client's programs via Promiseland's programming on KTAQ.

During this period, a disagreement between Simons and Milbank developed regarding a 10% withholding amount for expenses.  Simons claimed that both parties agreed to the 10% fee to cover expenses Promiseland incurred in connection with the collections and broadcasting on behalf of the Debtor.  Milbank maintains that no agreement was finalized as he needed a detailed expense report from Simons, and would need the approval of the Creditors before agreeing to such terms.  No written agreement was ever entered into by the parties.  Even though Milbank corresponded with Simons on several occasions about this issue, Simons continued to deduct 10% from each payment before sending the income checks to Milbank each month.

On October 26, 2010, Milbank and Everett Strong, an employee of Platinum Debt Group and former employee of Promiseland, went to Promiseland's headquarters, which shared the same office suites with Simons Broadcasting. While visiting, Strong accessed the traffic computer for Promiseland and downloaded a software program called AdEze.  The AdEze download included the traffic and billing information of the clients that purchased airtime through

Promiseland. Simons maintains that the "Client Information"[1] was not only proprietary and confidential, but it exclusively belonged to Promiseland as a separate and distinct entity from Simons Broadcasting. Milbank claims that as Plan Agent, he had the right to possess the Client Information under the Order and that there is no evidence that the data taken was confidential or proprietary.

On March 9, 2011, Milbank filed an adversarial proceeding in the Bankruptcy Court styled *Robert Milbank Jr., in his capacity as Plan Implementation Agent, Plaintiff v. Michael Simons, and Promiseland Television Network, Defendants*, which bears Adversary Proceeding No. 11-06005. In the adversary proceeding, Milbank sought compliance with the Order, an accounting, and turnover. Simons and Promiseland filed their Answer, Affirmative Defenses, and Compulsory Counterclaims to Complaint and Promiseland's Original Cross-Complaint against Milbank and Strong. Pursuant to 28 U.S.C. § 157(d), this Court withdrew the case, allowing Counter and Cross Plaintiffs to exercise their right to a jury trial.[2] Milbank and Simons filed a Motion for Summary Judgment, which was partially granted and partially denied.[3] The Court allowed

---

[1] Simons contends that the downloaded data was a trade secret as it contained information regarding Promiseland's clients, contacts, all billing information, contact information, pricing, schedule run times, and invoicing.

[2] *In re Clay*, 35 F.3d 190, 198 (5th Cir. 1994)(Court erred by not withdrawing case when defendant did not consent to trial in the bankruptcy court); *Rodriguez v. Countrywide Home Loans, Inc.*, 421 B.R. 341, 352 (S.D. Tex. 2009)("[W]hen one party requests a jury trial but does not consent to conducting the trial in the bankruptcy court, this may justify withdrawal of the reference.").

[3] *See* Doc. 96 (the Court granted summary judgment with respect to the claims of tortious interference with contract and prospective business relations against Milbank and Strong).

Simons and Promiseland to amend their counterclaims[4] and add their claims against Byrnes, Paramount Marketing Media, the Platinum Debt Group, Platinum Equity, and KTAQ of Dallas ("PDG").[5]

On October 7, 2013, a five-day trial was presented to a seven-member jury. As Plan Agent of the Estate, Milbank presented his claims against Simons for the operational income Simons was withholding from the bankruptcy estate. Simons and Promiseland, as Counter and Cross Plaintiffs, followed by presenting their claims against Milbank, Strong, and PDG before the jury as well. They argued that Milbank, Strong, and PDG stole trade secret information from Promiseland and should be found liable for conversion, trespass to personalty, theft under the Texas Theft Liability Act, misappropriation of a trade secret, harmful access of a computer in violation of Chapter 33 of the Texas Penal Code, violation of the Computer Fraud and Abuse Act, and civil conspiracy. Simons and Promiseland also submitted claims against PDG for tortious interference with contract and business relations, and a breach of contract claim against Milbank for money he claims was owed to him under the Plan.

At the close of all the evidence, Milbank, Strong, and PDG moved for a directed verdict under Rule 50 on all claims asserted against them. Milbank also moved for a directed verdict on the Estate's original compliance claim against

---

[4] *See* Doc. 118 (any new claims asserted in the Amended Complaint were separated to a new case number and immediately removed to the bankruptcy court).
[5] Since all the claims and facts are the same with respect to the alleged conduct of each party, they are grouped together and referred to as "PDG."

Simons and Promiseland. Simons and Promiseland responded to each motion and voluntarily dismissed their claims for tortious interference of current and prospective business contracts against PDG. After hearing the arguments and considering the evidence presented at trial, the Court agreed that there were no fact issues to be decided on any of the claims. Accordingly, the Court granted the motions for judgment as a matter of law asserted by Milbank, Strong, and PDG, ruled against Simons and Promiseland on all claims, and dismissed the jury.

## II. STANDARD OF REVIEW

A court may grant judgment as a matter of law when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for the party on that issue." FED. R. CIV. P. 50(a)(1). In order to survive a Rule 50 motion, "the party opposing the motion must at least establish a conflict in substantial evidence." *Anthony v. Chevron USA, Inc.*, 284 F.3d 578, 583 (5th Cir. 2002). When weighing whether there exists a "conflict in substantial evidence" a court must consider all the evidence presented at trial in the light most favorable to the non-moving party, and must disregard all evidence favorable to the moving party that the jury is not required to believe. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51 (2000); *Ellis v. Weasler Engineering Inc.*, 258 F.3d 326, 337 (5th Cir. 2001) ("[C]ourt must give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that

that evidence comes from disinterested witnesses.'" (quoting *Reeves*, 530 U.S. at 151)).

Substantial evidence must be "of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions" regarding the case's outcome. *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969)(en banc). "A mere scintilla of evidence is insufficient to present a question for the jury." *Id.* Thus, arguments premised only on conclusory allegations, speculation, and unsubstantiated assertions are inadequate to defeat a Rule 50 motion. *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir.2002) (citing *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1429 (5th Cir.1996)).

## III.  ANALYSIS

### A. Order Granting Milbank's Rule 50 Motion for Compliance of Bankruptcy Court Order Against Simons and Promiseland

Pursuant to the Confirmation Order, Simons was ordered to "promptly turn over to the [Plan Agent] any payments received by him or PromiseLand Television Network from third parties for use of airtime on KTAQ."[6]  Simons was also ordered to "provide copies of records reasonably requested by the Plan Implementation Agent that relate to the Debtor's business and operations."[7]  As Plan Agent, Milbank was appointed to manage the Debtor's assets and operations, and to

---

[6] Order at p. 7, ¶ 31.
[7] *Id.* at p. 7-8 ¶ 33.

conduct an orderly liquidation of the Debtor's assets.   The KTAQ television station was the primary asset of the Debtor that Milbank was charged with operating, until its auction sale at a later date.   As part of the operations, Milbank was given the authority to enter into a local marketing agreement with a third-party, who would assist in managing and generating income for KTAQ through the closing of the sale of the Station.   The income received by Milbank would be held as the cash collateral of PDG, and subject to the approval of PDG, the cash collateral could be used by Milbank in the operations of the Station Assets.[8]

At trial, Milbank testified that he could not agree to allow Simons to retain 10% of the payments received for use of airtime on KTAQ because the Order required Milbank to obtain 100% of the payments.   Additionally, Milbank contends that the Plan did not authorize him to make such an agreement with Simons without the prior approval of PDG.   Since the payments being received by Simons were cash collateral for PDG, the 10% deduction would constitute an operating expense, which required the approval of PDG.

While the details were never clarified to this Court, there was an agreement between Simons, Milbank, and Byrnes regarding the continued programming of Promiseland on KTAQ, and the collections of operational income of KTAQ by Simons.   Simons and Milbank met on April 21, 2010, to discuss the implementation of the bankruptcy plan including the operational income for KTAQ

---

[8] Plan at p. 14, § 5.03.

starting on February 1, 2010. At that meeting, Simons informed Milbank that he was withholding 10% of the payment he was collecting for airtime use based on the advice of his attorney. Simons told Milbank that the 10% withholding amount would cover Promiseland's expenses associated with the operational income he was receiving on behalf of KTAQ. Milbank informed Simons that he could not agree to the 10% withholding fee until Milbank provided information justifying the expense amount. Still, Simons submitted checks to Milbank for each month's operational income, minus the 10% expense fee he was claiming.

Even though Simons deposited each check, he continued sending correspondence to Simons explaining that he did not agree to the 10% withholding amount and would require a detailed report of expenses to be submitted to PDG for approval. Milbank continued receiving these "partial payments" for the operational income for each month; however, Simons did not submit any proceeds for the months of September 2010, October 2010, and November 2010. Milbank contends that Simons wrongfully withheld operational income totaling $139,995.60.

Simons claims that Milbank agreed to the 10% withholding expense, which was affirmed by Milbank's cashing of each check that included the 10% deduction. Simons also notes that with each check, Milbank was provided with an invoice reflecting the amount of the sales for each month as well as the 10% expense deduction. During his testimony at trial, Simons conceded that he received

10

letters, either to him or his attorneys, from Milbank that there was no agreement for

the 10% deduction. Simons also acknowledged that there were requests for

information to justify the expense amount; however, Simons did not send any

additional information to Milbank on the expenses he was claiming.

At the conclusion of Simons' testimony, the Court granted Milbank's Rule 50

Motion for two reasons. First, this Court finds that there was no contract formed

between Milbank and Simons on the 10% withholding amount. Courts in Texas

require the following for an enforceable contract: (1) an offer; (2) an acceptance in

strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each

party's consent to the agreed terms; and (5) execution and delivery of the contract

with the intent that it be mutual and binding. *Hubbard v. Shankle*, 138 S.W.3d

474, 481 (Tex.App.-Fort Worth 2004, pet. denied). A contract that is executed by

an agent without proper authority is unenforceable against the principal.

*Angroson, Inc. v. Independent Comms.*, 711 S.W.2d 268, 271 (Tex. App-Dallas

1986, writ ref'd n.r.e.). Pursuant to the Confirmation Order and Plan, which

Simons was a party of,[9] Milbank did not have the express authority to enter into an

operational expense agreement without the permission of PDG. Since Milbank

did not have the authority to enter into the expense fee arrangement without the

express consent of PDG, and Simons was constructively aware of PDG's requisite

---

[9] Simons argues that Promiseland and him, as an individual, were not separately served and made party to the Plan; however, Simons was involved as president of the Debtor entity, Simons Broadcasting.

approval to such an agreement, the Court finds that there are no fact issues to present to the jury on the existence of such a contract.

Secondly, even if an agreement existed between Simons and Milbank, it would have been terminated due to a material breach by Simons. Whether an individual's conduct constitutes a breach of contract is a question of law for the court to decide. *See E.P. Towne Center Partners, L.P. v. Chopsticks, Inc.*, 242 S.W.3d 117, 123 (Tex.App.-El Paso 2007, no pet.). Breach of a contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform. *See Stewart v. Sanmina Tex., L.P.*, 156 S.W.3d 198, 214 (Tex.App.-Dallas 2005, no pet.)(citing *Methodist Hosp. of Dallas v. Corporate Communicators, Inc.*, 806 S.W.2d 879, 882 (Tex.App.-Dallas 1991, writ denied)). Therefore, a party seeking an action for a breach of contract must establish that he performed, tendered performance of, or was excused from performing his contractual obligations. *Krayem v. USRP (PAC), LP*, 194 S.W.3d 91, 94 (Tex.App.-Dallas 2006, pet. denied).

Assuming that an agreement can be implied from the depositing of each check by Milbank, Simons failed to comply with the terms of this purported agreement, as Simons acknowledged the fact that he did not produce the detailed expense reports required by Milbank. Several emails and letters sent to Simons regarding the 10% fee and expense information were admitted as evidence at trial. Simons did not dispute Milbank's claim that any expense fee would be contingent

upon a detailed expense report and approval from PDG. Because Simons failed to perform a contractual obligation pursuant to his alleged agreement with Milbank, Simons is not entitled to the 10% fee under that agreement. *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994)("A fundamental principle of contract law is that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from any obligation to perform."); *see also Restatement (Second) of Contracts* § 235(2)(1981)("When performance of a duty under a contract is due any non-performance is a breach"). Thus, to the extent that an implied agreement existed between Milbank and Simons, the Court also finds that Simons materially breached the agreement by violating a condition precedent, which terminates the entitlement to any expense fee claimed by Simons.

Finding no fact issue warranting jury determination on any contractual dispute between Simons and Milbank, this Court granted Milbank's Rule 50 Motion and ordered Simons to comply with the Order by turning over all operational income owed to the Estate.

## B. Order Granting Rule 50 Motions Dismissing Claims Against Milbank, Strong and PDG

In their respective requests for judgment as a matter of law, Milbank, Strong, and PDG claimed that there were no facts supporting the merits of each claim asserted, and they were entitled to the protection from liability under the Plan and

13

Order.   In granting their Rule 50 Motions, the Court agrees that Milbank, Strong, and PDG are shielded from liability as there were no genuine fact issues to defeat their immunity.   The Court also finds no evidence to support submitting the merits of each claim for jury determination.   Accordingly, the Court ruled in favor of each directed verdict request for the following reasons:

### (1) Immunity Protection

Whether it is expressly stated in the bankruptcy plan itself or derived from the common law, the parties involved in the administration of a bankruptcy plan can be protected from liability for certain actions.   In the instant case, the Bankruptcy Plan explicitly provides that:

> Neither the Plan Implementation Agent nor PDG, nor any of their respective employees, officers, directors, direct or indirect equity interest holders, agents, advisors, attorneys, affiliates, or financial advisors, shall have or incur any liability to any holder of a Claim or Interest or any other party in interest, for any act or omission in connection with, relating to, or arising out of the Chapter 11 Case, the negotiation, formulation, and preparation of this Plan, the pursuit of confirmation of this Plan, the consummation of this Plan, or the administration of the Estate and the distribution of property under this Plan, *except for their gross negligence or willful misconduct*, and in all respects they shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.[10]

The law also recognizes a bankruptcy trustees'[11] general immunity from personal liability for actions grounded in his conduct as trustee.   *In re Thurman*,

---

[10] Plan at p. 22, § 13 (emphasis added).
[11] Though Milbank is designated as the Plan Implementation Agent, he has the same rights, duties and powers of a trustee.

163 B.R. 95, 100 n. 6 (Bankr.W.D.Tex. 1994)(citing *Yadkin Valley Bank & Trust Co. v. McGee*, 819 F.2d 74 (4th Cir. 1987)); *see also Boullion v. McClanahan*, 639 F.2d 213, 214 (5th Cir. 1981)(per curiam)(recognizing that "as an arm of the [c]ourt," because bankruptcy trustees are immune from liability for acting subject to the orders of the bankruptcy court).  Such "derived judicial immunity" provides broad protection to the trustee and other individuals acting on behalf of the court. *See Clements v. Barnes*, 834 S.W.2d 45, 46 (Tex. 1992) (court-appointed bankruptcy trustees acting within scope of authority entitled to derived judicial immunity).  "Once an individual is cloaked with derived judicial immunity because of a particular function being performed for a court, every action taken with regard to that function-whether good or bad, honest or dishonest, well-intentioned or not-is immune from suit."  *Ramirez v. Burnside & Rishebarger, L.L.C.*, No. 04-04-00160-CV, 2005 WL 1812595, *5 (Tex.App.-San Antonio Aug. 3, 2005, no pet.)(mem.op.)(citing *B.K. v. Cox*, 116 S.W.3d 351, 357 (Tex.App.-Houston [14th Dist.] 2003, no pet.)).

On the other hand, a trustee will relinquish his derived immunity where the trustee acts in "the clear absence of all jurisdiction."  *Clements*, 834 S.W.2d at 46 (citing *Mullis v. United States Bankr.Ct.*, 828 F.2d 1385, 1390 (9th Cir. 1987), cert. denied, 486 U.S. 1040 (1988)).  In other words, trustees will be held personally liable for acts taken outside the scope of their authority, or if they are found to have acted with gross negligence.  *United States v. Sapp*, 641 F.2d 182, 184 (4th Cir.

1981). Still, the immunity a bankruptcy trustee is entitled to will extend to professionals acting on his behalf. *Harris v. Wittman*, 2009 WL 4893658 (9th Cir. Dec. 21, 2009).

Texas law defines gross negligence as "that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it." *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 920 (Tex. 1980) (citing *Missouri Pacific Ry. v. Shuford*, 72 Tex. 165, 10 S.W. 408, 411 (1888)).[12] An individual acts with gross negligence if his actions objectively involved an extreme degree of risk concerning the magnitude of potential harm and, being subjectively aware of that risk, he still went forward with "conscious indifference to the rights, safety or welfare of others". TEX. CIV. PRAC. & REMS. CODE §§ 41.001. In light of that standard, a finding of gross negligence will require proof of both the objective and subjective components. *Wal-Mart v. Alexander*, 868 S.W.2d 322, 326 (Tex. 1993). Thus, there must be some facts that (1) the individual had actual awareness of the extreme risk created by his or her conduct, and (2) the individual's conduct involved an extreme degree of risk, a threshold significantly higher than the objective "reasonable person" standard for negligence. *Id.*

---

[12] Since "willful misconduct" is generally equated with gross negligence, any discussion of gross negligence includes willful misconduct. *IP Petroleum Co., Inc. v. Wevanco Energy, LLC*, 116 S.W.3d 888, 898 (Tex.App.-Houston [1st Dist.] 2003, pet. denied).

### a. Plan Agent Immunity for Milbank and Strong

As to the claims asserted against Milbank by Simons and Promiseland, Milbank's motion for judgment as a matter of law is premised upon his claim that Promiseland failed to offer any facts of gross negligence or willful misconduct at the hands of Milbank.[13]  Without such a showing, which is expressly enumerated under the Bankruptcy Plan, Milbank cannot be found personally liable for his actions related to his conduct as the Plan Agent.   The Court agrees and finds no fact issues from Simons that will defeat the immunity from liability extended to Milbank under the Plan and by the law.

Milbank was acting pursuant to and consistent with the Order when he obtained the Client Information and used the information in the administration of the bankruptcy.   On multiple occasions, Milbank attempted to obtain the Client Information directly from Simons, the president of the Debtor.   Testimony and evidence at trial revealed that Simons partially complied with these requests.   However, given the deadlines Milbank was under, he could not act in accordance with his duties as Plan Agent without the complete information.[14]

After consulting with attorneys and other relevant individuals, Milbank and Strong went to the shared offices of Promiseland and Simons Broadcasting, and

---

[13] Since Strong was assisting Milbank in his role as Plan Agent, the same legal arguments and defenses apply to Strong as well.   *See Harris*, 2009 WL 4893658.

[14] In addition to the Bankruptcy Court's deadlines, Milbank was also subject to deadlines imposed by the Federal Communications Commission (FCC) and their requirements for KTAQ and its transfer of ownership.

downloaded the Client Information from the traffic computer. The Client Information obtained by Milbank was necessary for a Plan Agent to account for all assets owned by the bankruptcy estate, and to maximize the value of those assets throughout the administration of the bankruptcy. Additionally, there was no provision in the Order expressly limiting Milbank to obtain necessary information from only Simons. In light of the circumstances, it may have been more practical for Milbank to obtain a court order before acquiring the Client Information;[15] however, "it is not for the court in such instances to substitute its own judgment in hindsight as to what should or should not have been done by the trustee." *In re Engman*, 395 B.R. 610, 624 (Bankr. W.D. Mich. 2008). The court should only be concerned with whether the trustee "had comported himself consistent with the duties required of him as a fiduciary of the bankruptcy estate." *Id.*

Since Milbank was reasonably acting in his official capacity, and there are no facts supporting claims of gross negligence or willful misconduct, Milbank is entitled to qualified immunity. *TTT Hope, Inc. v. Hill*, CIV.A. H-07-3373, 2008 WL 4155465 (S.D. Tex. Sept. 2, 2008). Furthermore, to the extent Strong was acting under the direction of Milbank, he is also entitled to the same protections of qualified immunity. *Id.* Accordingly, judgment as a matter of law is proper as

---

[15] Milbank testified that obtaining a court order from the Bankruptcy Court was considered. However, given his prior trustee experiences, Milbank knew that courts required trustees to exhaust all of their options before seeking compliance from the courts. Milbank also noted that involving the court would cause timely delay, which would have been detrimental to the television station and the Estate as a whole.

there is no showing that Milbank or Strong acted with gross negligence or willful misconduct.

### b. Immunity Under the Plan for PDG as the Creditor

PDG is also entitled to the immunity provision under the Plan itself. It is undisputed that PDG was also involved in the acquisition and use of the Client Information physically obtained by Milbank and Strong. As Creditors of the bankruptcy estate, PDG is also protected from liability if their conduct, under the Plan and Order, did not amount to gross negligence or willful misconduct.[16] As this Court will explain *infra*, the Estate was entitled to the Client Information as it was necessarily part of the Debtor's principal asset, KTAQ. Since PDG was authorized to use the Client Information under the Plan and Order, no showing of gross negligence or willful misconduct was supported by the record. As such, judgment as a matter of law for PDG is also appropriate, as they are protected from liability under the Plan.

### (2) Client Information Belongs to the Bankruptcy Estate

Although immunity protections entitled Milbank, Strong, and PDG to judgment as a matter of law on all claims asserted against them by Promiseland, they are also entitled to judgment as a matter of law on the merits of each claim as well. All of the causes of action Promiseland is asserting against Milbank, Strong, and PDG are premised on its claim that the entire Client Information downloaded

---

[16] *See* Plan at p. 22, § 13.

belonged exclusively to Promiseland. As the dispositive factor, the ownership interest of the Client Information will determine the resolution of the merits of each claim asserted by Promiseland. After reviewing the evidence and relevant testimony at trial, this Court finds that the Client Information also belonged to Simons Broadcasting.

Prior to filing for bankruptcy in November 2008, Simons Broadcasting was a for-profit entity controlled by Simons Asset Management as its general partner, and Simons as its limited partner. Simons was also listed as president of Simons Asset Management. On August 12, 2005, Promiseland Television Network, Inc. was incorporated as a non-profit corporation under Article 32 of the Texas Non-Profit Corporation Act, and recognized as a Section 501(c)(3) entity under the Internal Revenue Code of 1986. Under its Articles of Incorporation, Simons, his wife, and sister were listed as Promiseland's board of directors. Simons was also listed as Promiseland's president.

On September 1, 2005, Promiseland and Simons Broadcasting entered into an Air Time Agreement giving Promiseland the exclusive right to lease all of the airtime on KTAQ. Pursuant to the agreement, Promiseland was required to pay for the lease according to a monthly payment schedule. The agreement expressly provided that the relationship between the parties is that of a lessor-lessee, and no agency relationship was intended. Simons signed the agreement on behalf of both parties to the contract: as president of Promiseland,

and as president of Simons Asset Management, the general partner for Simons Broadcasting.

At trial, it was revealed that in 2008, Simons amended the Air Time Agreement and reduced the payment amounts Promiseland would pay to Simons Broadcasting. Simons explained that the reduction was necessary because of the downturn in the economy and it was not feasible for Promiseland to continue paying the increased payment amounts. Simons claimed that he was acting in his respective capacities for Promiseland and Simons Broadcasting; the agreement continued being an arm's-length transaction; and that the amendment was for the best interest of both Promiseland and Simons Broadcasting. In the end, however, the amendment was never reduced to writing.

### a. Air Time Agreement Did Not Grant Promiseland Exclusive Control of the Client Information

Basic contract law requires at least two distinct parties to enter into a contract. "A person cannot legally enter into a contract with oneself, that is to say, it is not legally possible for one mind to make a contract." 14 TEX. JUR. 3d § 14. While an individual may attempt to act in more than one capacity, an agreement with oneself, even in another capacity, is a legal fiction that should not "rise to the dignity of a contract." *People's Bank of Butler v. Allen*, 344 Mo. 207, 212, 125 S.W.2d 829, 831-32 (1939); *see also 1 Williston on Contracts* § 3:2 at 265 (4th ed.) ("Even where an individual is acting in more than one capacity, as for example as

trustee, executor, or partner, it is generally not permissible for him to deal with himself in another capacity.") Therefore, when an individual signs an agreement in two different capacities, the court can look at the legal relations of that person and rule accordingly. *Bobbitt v. Alamo Cas. Co.*, 241 S.W.2d 464, 467 (Tex. Civ. App. 1951) (refusing to give legal effect to a contract a one-man corporation entered into himself as an employee).

The Air Time Agreement between Promiseland and Simons Broadcasting, which resulted in the development of the Client Information, was entered into between Simons and himself. Though purportedly acting in different capacities, the Agreement was not an arm's-length transaction. Furthermore, it is uncontested that Simons unilaterally modified the Agreement on behalf of both entities. Therefore, to the extent that the Air Time Agreement may be used to grant exclusive control of the Client Information to only Promiseland, it is without legal effect.

### b. Simons Broadcasting is the Alter Ego of Promiseland and is Entitled to the Client Information

Even beyond the contractual issues discussed above, the alter ego theory, as recognized under Texas law, provides equitable reasons to discount any distinction between the two entities. "[A]n alter ego remedy applies when there is such an identity or unity between a corporation and an individual or another entity such that all separateness between the parties has ceased and a failure to

disregard the corporate form would be unfair or unjust." *In re Southmark Corp.*, 95 F.3d 53 (5th Cir. 1996) (citing *Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142, 1152 (5th Cir. 1987)). Accordingly, a "corporate veil" may be pierced "where a corporation is organized and operated as a mere tool or business conduit of another." *Castleberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986). Thus, courts should "disregard the corporate fiction, even though corporate formalities have been observed and corporate and individual property have been kept separately, when the corporate form has been used as part of a basically unfair device to achieve an inequitable result." *SSP Partners v. Gladstrong Investments (USA) Corp.*, 275 S.W.3d 444, 454 (Tex. 2008) (citing *Castleberry*, 721 S.W.2d at 271-72).

The factors relevant to the court's alter ego inquiry include: "the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes." *Lucas v. Texas Indus., Inc.*, 696 S.W.2d 372, 374 (Tex. 1984); *Gentry v. Credit Plan Corp.*, 528 S.W.2d 571, 573-75 (Tex. 1975). While the alter ego theory is typically utilized in cases where an entity attempts to shield itself from liability, Texas courts have extended its application to other types of cases. *See In re Faith Missionary Baptist Church*, 174 B.R. 454, 466-69

23

(Bankr. E.D. Tex. 1994)(extending the alter ego theory in an IRS levy claim against a church and its pastor); *Zisblatt v. Zisblatt*, 693 S.W.2d 944, 952 (Tex.App.-Fort Worth 1985, writ dism'd) (applying alter ego theory in an action for divorce "to properly characterize corporate assets as part of the community estate."); *Dillingham v. Dillingham*, 434 S.W.2d 459, 462 (Tex. Civ. App.—Fort Worth 1968, writ dism'd)(court affirmed trial court's division of property, which awarded portion of increased value of husband's wholly owned corporation, based on finding that corporation was alter ego of husband).

In an alter ego case involving a church, the court noted that "the legal fiction between an individual and an entity may be pierced if the entity 'has been used as part of a basically unfair devise to achieve an inequitable result.' " *In re Faith Missionary Baptist Church*, 174 B.R. at 466-69 (Bankr. E.D. Tex. 1994)(quoting *Castleberry*, 721 S.W.2d at 271). In that case, the bankruptcy court focused on the fact that assets from the pastor were being transferred to a church that was controlled by the pastor and his family. Though there was evidence that the church was being operated as a church, the unity of interest between the pastor and the church was undeniable. *Id.* The court held that the pastor was the alter ego of the church and the assets of the church could be subjected to the IRS lien against the pastor. *Id.*; *see also See Loving Saviour Church v. United States*, 728 F.2d 1085 (8th Cir. 1984)(church established as an unincorporated association was the alter ego of the individual who was both a pastor and trustee of the church,

24

thus IRS levy not wrongful); *United States v. Kitsos*, 770 F.Supp. 1230 (N.D.Ill. 1991)(individual's continued exercise of dominion over assets purportedly transferred to the church was grounds to disregard the church's independent existence), aff'd, 968 F.2d 1219 (7th Cir. 1992); *Church of Hakeem v. United States*, No. C–79–0741 SW, 1979 WL 1475, 79–2 USTC ¶ 9651 (N.D.Cal. 1979)(levy not wrongful because of unity of interest between the individual and the church).

Upon reviewing the evidence in light of the relationships Simons had with Simons Broadcasting and Promiseland, the Court finds the Client Information is property of the bankruptcy estate because Promiseland is the alter ego of Simons Broadcasting. Promiseland is controlled by Simons and his family members. Simons was the sole individual in control of Simons Broadcasting prior to its bankruptcy, irrespective of what capacity Simons acted under. Both Simons Broadcasting and Promiseland shared the same offices at the Hillcrest Church in Dallas, Texas. Clients would mail their tapes to Promiseland, which would have been "walked across the hall" to Simons Broadcasting for broadcasting.

Given the evidence, it is clear that Simons Broadcasting and Promiseland were alter egos of each other. Though some corporate formalities between the entities were observed prior to the bankruptcy, a necessary requirement given Promiseland's existence as a non-profit organization, the Client Information was freely accessible to both entities by means of Simons. *See Castleberry*, 721